SAME CASE—APPLICATION FOR A RE-HEARING.

The Supreme Court, as the guardian of the constitutional rights of the people, is authorized to pronounce on the constitutionalty of the acts of the two other departments of the government ; but no act of either will be pronounced unconstitutional unless manifestly so, and the incompatibility with the Constitution must be evident.

*Roselius*, for a re-hearing.   The great importance of the ques-

tion involved in this cause, and a strong conviction that the opinion pronounced by the majority of this honorable court is erroneous, will, I trust, be considered as a sufficient justification for making this last effort to impart to your Honors, if possible, the depth and sincerity of that conviction.

The Constitution of a State, (in the eloquent language of the Supreme Court of the United States,) is stable and permanent, not to be worked upon by the temper of the times, nor to rise or fall with the tide of events; notwithstanding the competition of opposing interests, and the violence of contending parties, it remains firm and immovable as a mountain amidst the strife of storms, or a rock in the ocean, amidst the raging waves. It is a clear position, that if a legislative act oppugns a constitutional principle, the former must give way, and be rejected on the score of repugnance. It is a position equally clear and sound, that in such case, it will be the duty of the court to adhere to the Constitution, and to declare the act null and void. The Constitution is the basis of legislative authority; it lies at the foundation of all law, and is a rule and commission by which both legislators and judges are to proceed. It is an important principle, which, in the discussion of questions of the present kind, ought never to be lost sight of, that the judiciary in this country is not a subordinate, but a co-ordinate branch of the government.

If the great principles of constitutional law here proclaimed, are correct, and that they are, I presume, no one will deny, I am utterly at a loss to conceive by what process of reasoning the mind can be brought to the conclusion, that the removing power, which is now, for the first time, claimed by the Governor of this State, can, in any case, be derived from any other source than the Constitution. The Government itself is the creature of the Constitution. And all the powers of the three great departments of the government are chalked out and delegated by it. Now to contend that a power, the exercise of which is prohibited by the Constitution, can, nevertheless, be asserted under a law anterior to that instrument, is, to say the least of it, a novel proposition. I can understand that laws enacted subsequently to its adoption, conferring powers on the different branches of government, may be viewed as a legislative interpretation of, or as carrying into

effect, the Constitution, and as such, entitled to great respect. But I cannot comprehend, how an important political power can be assumed under a law antecedent to the Constitution. That question, however, will be more fully discussed in another part of this argument.

In the opinion delivered by the majority of this honorable court, the doctrine is fully recognized, "that the people of Louisiana have thought proper to separate the appointing from the removing power;" and, "that under the Constitution of Louisiana, the Governor is without authority to remove an incumbent from office, whenever the duration of that office has been fixed and determined by law, whatever may be its duration, whether it be for a term of years, or during good behavior." But an exception to this rule is established, by the court, "in reference to those offices which existed previously to the Constitution, and which have not since been limited by law." His Honor, Judge MORPHY, uses language equally strong and explicit. He says : " I wish it to be distinctly understood, that a majority of this court, in sustaining the appointments which give rise to this controversy, do do not do it on the ground assumed in the argument, that there is in the Executive of this State, a right of removal, which is incidental to his power of appointment; we hold, on the contrary, I believe unanimously, that the Governor alone, or the Governor and Senate, have no such power. It is clear, that the framers of our Constitution had in view the doctrine which had obtained under the Federal Government, that the power of removal belonged to the President alone, as an incident of his power of appointment, when they made it the duty of the Legislature to determine the time of duration of the several public offices, and prescribed a specific mode of removal for all civil officers." (8th section of the 6th article of the Constitution.) And in another part of the same opinion, it is said : " The Governor alone, or the Governor and Senate, would have vainly attempted to remove the Master and Wardens of the Port of New Orleans, without making new appointments, because the power of removal does not reside in them. But their power of appointment, under the law of 1805, is not the less legal and constitutional, because it may have for its consequence the removal of the former incumbents."

Thus, then, it is expressly decided, that, under the Constitution of Louisiana, the power of removal is not incidental to the appointing power; and that neither the Governor alone, nor the Governor and Senate collectively, are vested with the power to remove a public officer. But it is, at the same time, gravely asserted, that although the Governor and Senate have no power to remove the plaintiffs, yet they can attain the same end by making new appointments! In other words, that the plain behest of the Constitution can be evaded, and its great objects defeated, by the Chief Magistrate of the State, bound by a solemn oath to support and obey its mandates, by resorting to a mere quibble—a subterfuge—a trick. Surely, before such an astounding doctrine finally receives the sanction of this exalted tribunal, your Honors may well pause, in order to be fully convinced that there is not some insidious fallacy hid in the apparently specious argument which leads to such a result.

The court seems to take for granted, that the law of 1805, authorizes the Governor to renew his appointments of Port Wardens whenever he thinks proper. There can be no doubt, that the Governor of the Territory of Orleans possessed such a power. But it may well be questioned whether he derived it from the act of 1805. That functionary, as the court justly observes, derived his authority from Congress, and that authority was little inferior to that of a Governor General of a Spanish Province. He had unlimited power to appoint, and remove, all the inferior officers of the territorial government at his sole will and pleasure. Hence, it is clear, that he possessed the power of removing the Port Wardens, independent of the act of 1805. It is a remarkable fact, however, that even the Governor of the Territory never exercised the power of removal with regard to the Port Wardens. The attempt now made, is the first on record, since the office was created in 1805. The law of 1805, in its terms, only confers on the Governor power to appoint, whenever it shall become *necessary*. It provides, " that it shall be lawful for the Governor of this Territory to appoint, as often as shall be necessary, one fit and proper person to be Master, and three other fit and proper persons to be Wardens of the said Port of New Orleans," &c. Could even the Governor of the Territory, by virtue of this provision of law,

have appointed Port Wardens, when there existed no necessity for the appointment ?  He is empowered to act on the *happening* of a contingency ; and not to *create* that contingency.  It is said, that he is the sole judge, whether the necessity exists, on which the exercise of his power to appoint depends.  Admitting for the present, and only for the sake of the argument, that a law, conferring political power on the Governor of the Territory, can be invoked by the Executive of the State—(a proposition, which appears to me, wholly untenable, as I shall endeavor to demonstrate hereafter)—has the Governor, in the case before the court, given any decision as to the existence of that necessity ?  I am answered in the affirmative, and told that the new appointments are evidence of such decision.  But I must be permitted to intimate a doubt, whether this conclusion is fairly deducible from the premises.  Indeed, we are not left to inference, or permitted to indulge in conjecture in this matter.  The truth is notorious. The new appointments were not made on the score of necessity, but with the sole view of extending executive patronage for party purposes.  It is openly and unblushingly avowed, that the plaintiffs have been *punished* for opinion's sake—that they have been sacrificed on the altar of intolerance and persecution.  It is a well known fact, that they are among a host of worthy officers who have, within the last few months, fallen victims to an odious and detestable system of proscription, lately introduced into our fair State.  This is the *necessity* on which the Governor has acted— no other.  The fact, then, of having made new appointments does not, *per se*, prove that even the Governor himself considered it *necessary* to do so, unless a desire to reward his political adherents, and to punish those who differ from him in politics, constitute that necessity.  With whatever effrontery unprincipled demagogues, or brawling politicians, may proclaim from the house-tops and in the market-places, that " *the spoils belong to the victor,*" such an infamous doctrine can never receive the sanction of a court of justice.

As to the argument drawn from the translation of the law of 1805 into the French language, it is founded on the erroneous impression, that the laws of that year were passed in both languages ; or, in other words, that both languages are to be con-

sidered together, and construed with reference to each other as one text. The fact is different. In 1805, the laws were passed in the English language only; and afterwards translated for the benefit of those who did not understand that idiom. The translation of the law in question is erroneous, and, of course, cannot control the original.

Be this, however, as it may. I apprehend it is of little importance to a correct decision of the present controversy, whether, under the Territorial Government, the tenure of the office of Port Wardens, was at the will of the Governor, or not. It will hardly be pretended, that the Executive of the State of Louisiana possesses the same powers which were vested in the Governor of the Territory of Orleans. The Constitution has granted to the Executive of the State, the power to appoint officers, by and with the advice and consent of the Senate, and has authorized him to make temporary appointments to fill vacancies happening during the recess of the General Assembly, without the co-operation of the Senate; but has expressly withheld from him the power of removal. Now, does it not result, from the very nature of things, that the appointing power cannot be exercised, unless there be an office vacant? Can an officer be appointed if there is no office to be filled? The officer and the office are co-relative—the one cannot exist without the other. I can imagine but five ways in which an office can be, or become vacant: by the creation of a new office, by the expiration of the term of the incumbent, by his death, his resignation, or his removal. In the case under discussion, the office of Port Wardens was not vacant when the new appointments were made. The strange anomaly is, therefore, presented, of officers being appointed, when there was no office to be filled.

The solution of the question, whether the Governor of the State can remove or supersede the Port Wardens, by virtue of the act of 1805, depends, I humbly conceive, not so much on the inquiry, whether or not there is a repugnancy or inconsistency between the 8th section of the 6th article of the Constitution and that law, as on a correct understanding of the great principles which must necessarily govern the interpretation of the fundamental compact by which the government itself is organized.

In the language of the court, "*the people of Louisiana have thought proper*," in their Constitution, "*to separate the appointing from the removing power*." With such a clear enunciation of the constitutional principle, is it not a somewhat extraordinary proposition to contend, that the will of the people, thus solemnly expressed, can be disregarded, under color of a legislative enactment antecedent to the Constitution ? In republican governments, all political power emanates from the people ; and is delegated by them in the Constitution. The power of removal is called by Chancellor Kent, one of a transcendant nature. On what ground, then, can it be argued, that such a power can be sustained by an act of the Legislative Council of the Territory of Orleans ? That body legislated for a temporary government, without any other Constitution than the act of Congress creating the Territory of Orleans, and its laws were subject to the revision of Congress. In the case of *The Church of St. Francis of Pointe Coupée* v. *Jean Martin*, 4 Robinson, 62, decided in February last, it was urged, that the provisions of the Treaty of Cession, relative to the free exercise of the Catholic religion, were yet in force in this State. But the court observed : " Since the 30th of April, 1812, the day on which Louisiana took her rank as an independent State among her sisters, that article of the treaty has ceased to have any practical effect whatever ; and has now become obsolete. The promised protection was that of the United States, which abandoned the power by the erection of the Territory into a State fully able to afford her citizens, and even strangers within her jurisdiction, every needed protection."

If the Governor of the State can derive his authority to remove the Port Wardens from the act of the Legislative Council of the Territory of Orleans, then we are led to the absurd conclusion, that a portion of the political power with which our government is invested, does not emanate from the people, but from a body, exercising its subordinate legislative power, seven years before the people of Louisiana assumed the high prerogative of self-government.

Let it not be supposed, that, in advancing this argument, I have lost sight of the clause in the Constitution, which provides, that "*all laws now in force in this Territory, not inconsistent with*

*this Constitution, shall continue and remain in full effect, until repealed by the Legislature.*" This clause, as well as that relative to the continuance in office of the Governor, Secretary, Judges, and all other officers, was necessary to prevent anarchy and confusion. Without it, we would have had a government without laws. But the laws here spoken of, cannot embrace such as confer political power on any department of the government. All those powers are delegated by the Constitution itself. It is true, the office of Port Wardens was created by the act of 1805. But I deny, that the Governor of the State of Louisiana, can, or does, appoint those officers under it. That law authorizes the Governor of the Territory of Orleans to make the appointment. And, as before observed, there is no provision in the Constitution which transfers the powers vested in that officer, to the Governor of the State. To contend for the proposition, that the Executive can exercise all the powers formerly possessed by the Governor of the Territory, will irresistibly lead to the conclusion, that, instead of being blessed with a Chief Magistrate, whose powers and duties are defined in a written Constitution, we are. cursed, with an almost absolute despot, wielding the same unlimited authority as a Governor General of a Spanish Province. To confound the powers of the Executive of the State, with those of the Governor of the Territory, is, in my humble opinion, a palpable error. The appointing power of the Governor of the State of. Louisiana, like all his other powers, is derived from the Constitution ; and he can only exercise it in the mode pointed out in that instrument. Under the general appointing power granted to him by the Constitution, he appoints the Port Wardens, as well as all other officers, without regard to the law of 1805. According to this view of the subject, which I believe to be a correct one, it is perceived that the question of consistency, or repugnancy, between the Constitution and the act of 1805, does not arise at all.

The position taken by his Honor, Judge Garland, which the whole bar, (with the exception of the counsel for the appellants) spontaneously pronounced to be unanswerable, is in perfect harmony with, and comes in support of my argument ; I allude to that part of his dissenting opinion in which he says—

" When the Constitution fixes a rule of action, or directs the mode in which a certain thing is to be done, I do not believe, that the Legislature has the power to specify another mode, and sustain it on the ground, that the modes are concurrent. I cannot realize the idea of concurrent, constitutional, and statutory provisions and remedies. When the Constitution provides a means or rule, I consider it paramount to statutory law. If the statutory provision is the same as the constitutional, it is useless ; if it be different, it must be inconsistent and derogatory, and therefore void."

The majority of this honorable court has, however, placed its opinion on the ground, that the law of 1805 is not repugnant to the Constitution, except so far as to require the co-operation of the Senate, in the appointment of the Port Wardens ; and that, by virtue of that law, the Governor, by, and with the advice and consent of the Senate, can appoint at will, and by that means *remove*, or, rather *supersede* the incumbents of the office. I will, therefore, examine the question of repugnancy.

And in the first place, I beg leave to observe, that although in many cases it may be true, that " *the same rules which govern in the construction of statutes are applicable to the Constitution, when supposed to conflict with an act of ordinary legislation ;*"— yet, I believe, that in the present case, that is not the proper test of consistency, or repugnancy, between the Constitution and the law. In ordinary controversies, arising out of private interests, when the constitutionality of a law is questioned, the well established rule is, that " the question, whether a law is void for its repugnancy to the Constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in a doubtful case. It is not on slight implication, and vague conjecture, that the Legislature is to be pronounced to have transcended its powers, and its acts to be declared void. The opposition between the Constitution, and the law, should be such, that the Judge feels a clear, and strong conviction of their incompatibility with each other." *Fletcher* v. *Peck*, 6 Cranch, 87. But when, as in the present case, a question arises, whether a great political power can be exercised by a branch of the government under a law antecedent to the Constitution, it seems to me, that different prin-

ciples apply. The inquiry, in such a case, is not simply, " *is the act declaring the office of Port Wardens to be at the will of the Executive, repugnant to that clause of the Constitution, which authorizes the removal of public officers by an address of two-thirds* ;" but, whether the exercise of the power is prohibited by the Constitution ? This I think, is the only fair, and proper mode of putting the question. And when thus propounded, it is not difficult to solve it.

As has before been seen, your Honors all agree, that " *the people of Louisiana, have thought proper to separate the appointing from the removing power ;*" and that " *the Governor alone, or the Governor and Senate, would have vainly attempted to remove the Master and Wardens of the Port of New Orleans, without making new appointments, because the power of removal does not reside in them.*" Then, with due deference, there is an end to the argument ; and it is impossible for the most expert dialectician to deny, that there is the most palpable repugnancy between the Constitution, and the act of 1805. The Constitution prohibits the Governor, as well as the Governor and Senate, from removing any public officer ; the law of 1805, (according to the construction given to it by this court,) authorizes the removal of the officers in question, at the will of the Governor and Senate. It is difficult to conceive a case of more direct and clear repugnancy.

The distinction attempted to be established between the act of *removing*, and of *superseding* an officer, is, to my mind, unintelligible. I own, that I am not sufficiently versed in casuistry to understand the difference between the one and the other mode of expression. In ordinary parlance, when we say, that an officer has been *superseded*, we mean, that he has been *removed*, and another appointed in his place. The same definition of the word is given by lexicographers. Webster, in his dictionary, informs us, that *superseded* means *displaced*, and he defines the word *displace* to be equivalent " *to remove from any state, office or dignity.*" Such likewise is the opinion of all the Constitutional lawyers of the Union. Story, in his Commentaries on the Constitution, vol. 3, p. 390, says : " The language of the Constitution is, that the President shall nominate, and, by and with the advice

and consent of the Senate, appoint, &c.   The power to nominate does not naturally, or necessarily include the power to remove ; and if the power to appoint does include it, then the latter belongs conjointly to the Executive, and the Senate.   In short, under such circumstances, the removal takes place in virtue of the new appointment, by mere operation of law.   It results, and it is not separable, from the appointment itself." See also the Federalist, No. 77, Kent's Com. vol. 1, p. 308, *et seq*.   Indeed the idea, that there was any real difference between the removal of an officer by a new appointment, and that which takes place by a distinct and separate act, never before occurred to any person.   It appears to me a mistake to suppose, that the removal in the present case, was the mere consequence of the new appointments.   On the contrary, the new appointments constitute the very act of removal of the former incumbents.   There is no sort of analogy between this case, and that cited, of Judges being legislated out of office, by abolishing the courts over which they preside.   The appointment of a Judge, cannot abridge, or curtail the power of the legislative branch of the government, on a subject of general legislation.   Consequently, it would be absurd to contend, that the Legislature could not make a change in the organization of the judiciary, because by abolishing a court, the tenure of office of the Judge of that court might be indirectly affected.   I say, indirectly, because it is not true, that by abolishing the court, the Judge is removed *from office*.   There is a wide difference between removing a man from an office, and abolishing the office.   It would be a difficult matter to remove a person from an office which has ceased to exist.   The law of 1825, abolishing Justices of the Peace, and creating the City Courts, is perfectly constitutional on another ground.   Justices of the Peace, are not Judges within the the purview of the Constitution, nor is the tenure of their office protected by it.   They have always been considered as ministerial officers, although invested with civil jurisdiction. That point has been decided and settled, both in different States of the Union, and in England.

But I contend, that the Legislature cannot, constitutionally, legislate a Judge out of office by abolishing the court over which he presides, if his removal be the sole object which the Legisla-

ture has in view. Such a law, I think, would be clearly unconstitutional. The difficulty in such a case would be, how to establish the fact, that the intention of the Legislature was to remove the Judge. The impossibility of establishing that fact, would, no doubt, in a great majority of cases, make the constitutional objection unavailing. If, however, a case should occur, in which the intention was evident, no court, I trust, would shrink from the responsibility of declaring the law unconstitutional. Suppose, for instance, our Legislature, during its last session, had abolished the Criminal Court, and a few days, or weeks afterwards, had re-established the same court precisely as it before existed, would the Judge, under such circumstances, have lost his office ? The practice of legislating Judges out of office has always been considered as unconstitutional. But it is one of those acts of lawless power, which the judiciary can seldom control.

The permanency and stability of our free, and liberal institutions, have justly excited the wonder, and admiration of the civilized world. But if the doctrine be once admitted, that " *it may sometimes happen, that in performing an act perfectly constitutional in itself, an object may be accomplished, indirectly, which could not be constitutionally done in a direct manner,*" it does not require the gift of prophecy to predict the impending fate of those institutions. The Constitution, instead of being the charter by which the rights and privileges of the citizen are guarantied and protected, will only call forth the exercise of sophistry and refinement to divine the most ready means of evading its provisions. The minions and instruments of power, will, before long, be found performing the same solemn farce among us, of which history furnishes so many examples. The ingenuity and flattery of the Roman lawyers fabricated the absurd story, that the people had divested themselves of, and delegated to the Emperors the whole legislatve power, by the *lex regia.* With such a rule of interpretation, the Constitution would soon be frittered away, and its great landmarks of liberty demolished.

The well established and universal principle of law, as well as logic is, that whatever is not permitted to be done directly, cannot be done indirectly. It is, certainly, of infinitely more importance

not to violate that rule with respect to the Constitution, than as it regards acts of ordinary legislation. The truth is, the idea is entirely inadmissible, and cannot be supported even by the color of a plausible argument. No possible case can be imagined, in which an unconstitutional object can be accomplished by constitutional, or legal means. To say so, is a contradiction in terms. It has already been seen, that the illustration by which the position is sought to be supported is not analogous.

The constitutional history of the country, presents many attempts, at different periods, to evade various provisions of the Constitution of the United States. One of the most striking instances, is the tax laid by the State of Maryland, on importers of foreign merchandize. In 1821, the Legislature of that State passed a law, requiring all importers of foreign goods by the bale, package, &c., to take out a license, for which they shall pay fifty dollars, &c. The State of Maryland endeavored to defend the constitutionality of that law, on the ground that it was enacted in the ordinary exercise of the taxing power. In noticing that argument, Chief Justice Marshall observes—

"But if it should be proved, that a duty on the article itself would be repugnant to the Constitution, it is still argued, that this is not a tax upon the article, but upon the person. The State, it is said, may tax occupations, and this is nothing more.

"It is impossible to conceal from ourselves, that this is varying the form, without varying the substance. It is treating a prohibition which is general, as if it were confined to a particular mode of doing the forbidden thing. All must perceive, that a tax on the sale of an article, imported only for sale, is a tax on the article itself. It is true, the State may tax occupations generally, but this tax must be paid by those who employ the individuals, or it is a tax on his business. The lawyer, the physician, or the mechanic, must either charge more on the article in which he deals, or the thing itself is taxed through his person. This the State has a right to do, because no constitutional provision extends to it. So, a tax on the occupation of an importer is, in like manner, a tax on importation. It must add to the price of the article, and be paid by the consumer, or by the importer himself, in like manner, as a direct duty on the article itself would be made. This

the State has no right to do, because it is prohibited by the Constitution." *Brown* v. *State of Maryland*, 12 Wheat. 419.

Many other cases might be referred to, in which " an unconstitutional object" was sought to be accomplished, by, what the parties considered, legal means. But such pretensions have always been repelled and discountenanced by the judiciary. It has uniformly been held, that an act which, in its direct tendency, infringes the Constitution, is unconstitutional.

Can it be reasonably argued, that notwithstanding the specific mode of removing public officers pointed out by the Constitution, there may be a concurrent power of removal in the Governor? The clause on the subject of removal is peculiar to the Constitution of Louisiana. A similar provision is not to be found in any of the Constitutions of the other States of the Union. As early as 1789, the question, whether the President of the United States possessed the power to remove public officers, as an incident to his appointing power, gave rise to a very animated debate in Congress. And although it was decided (in the House of Representatives by a small majority, and in the Senate, by the casting vote of the Vice President of the United States,) in favor of the existence of the power in the President, yet the correctness of that decision has been doubted by some of the greatest constitutional lawyers of the country. Among others, Chancellor Kent expresses his most decided dissent. He says, in his 14th Lecture, vol. 1, p. 311 :—

" It is a striking fact in the constitutional history of our government, that a power so transcendent as that is, which places at the disposal of the President alone, the tenure of every executive officer appointed by the President and Senate, should depend upon inference merely, and should have been gratuitously declared by the first Congress, in opposition to the high authority of the *Federalist ;* and should have been supported or acquiesced in by some of those distinguished men, who questioned or denied the power of Congress even to incorporate a National Bank."

The framers of the Constitution of Louisiana, were not ignorant of the discussions to which this question had given rise, and of the conflicting opinions which were entertained in relation to it. They took the subject into their serious consideration, and came

to the conclusion, that it was safer and more republican to separate the appointing power from the removing power. With this view, the 8th section of the 6th article was inserted in the Constitution. The language in which that section is couched is clear and explicit ; it is as follows :

" The Legislature shall determine the time of duration of the several public officers, when such time shall not have been fixed by the Constitution ; and all civil officers, except the Governor, and Judges of the Superior and Inferior Courts, shall be removable by an address of two-thirds of the members of both Houses, except those, the removal of whom has been otherwise provided for by this Constitution."

The first part of this section of the Constitution enjoins on the Legislature, the duty of determining the duration of those offices, the tenure of which is not fixed by that instrument itself. The second branch of the section provided, as before stated, a specific mode of removing public officers without cause. The duty imposed, and the power conferred, are independent of each other. The removing power undeniably exists, although the duration of the office has not been determined. The correctness of this position is admitted in the opinion of the court. But the court says, that " in relation to an office originally within the discretion of the Executive, and the duration of which has not since been expressly limited by law, the power to create a vacancy by removal exists, at the same time, in the Governor and Senate, and in the General Assembly, under the 8th section of the 6th article of the Constitution." It is difficult to reconcile this mode of reasoning with the text of the Constitution on which it is based. A few lines before, the existence of the removing power in the Governor and Senate is most explicitly denied. " I do not mean to say, (observes his honor, Judge Bullard,) that the Governor and Senate may remove an officer, and make a new appointment, when the office has been limited by law. On the contrary, I am of opinion that he cannot," On what foundation does the distinction here taken rest? We look in vain for it in the language of the Constitution. The expressions used are, " *all civil officers*, except the Governor, and Judges of the Superior and Inferior Courts, shall be removable by an address," &c. Why should

there be two modes in which the Port Wardens can be dismissed from office, when the Constitution has provided one uniform rule for the removal of all civil officers? Can the Governor and Senate remove an officer from an office created since the adoption of the Constitution, if its duration is not limited? It can hardly be denied, that the assumption of the power in such a case would be clearly unconstitutional. And it appears to me difficult to assign any good reason, why a law, anterior to the Constitution, should not be liable to the same objection.

Your Honors remark, that the 8th section of the 6th article of the Constitution must be construed in such a manner, as to give effect to its concluding sentence, to wit : " *except those, the removal of whom has been otherwise provided for in this Constitution.*" The correctness of this observation no one will contest; but it is not so easy to see its bearing on the question before the court. It cannot but be considered as entirely foreign to the subject under discussion, unless it be asserted, that the act of 1805, has been incorporated into, and forms a part of the Constitution. Such an idea is, of course, too extravagant to be insisted on by any one. The exception, evidently, refers to the 10th section of the 4th article, which provides—

" The Clerks of the several Courts shall be removable for a breach of good behavior by the Court of Appeals only, who shall be judge of the fact as well as of the law."

In this section, the Constitution of Louisiana has again adopted a different rule from that laid down in the Constitution of the United States. Under the latter, clerks of court hold their offices at the will of the Judges, on the principle that the power to remove is incidental to the appointing power, as was decided by the Supreme Court of the United States, in the case *Ex parte Hennen*, 13 Peters' Reports, 230. By our Constitution, the clerks of the several courts, are made independent officers, and can only be removed for a breach of good behavior. They enjoy, besides the exclusive privilege of being tried, in the first instance, before the highest tribunal in the State. No one ever dreamt that the Governor, or the Judges of the respective Courts, had a concurrent power with the Supreme Court, to remove clerks. Yet the

identical expressions, "*shall be removable*," are used with regard to clerks and to *all civil officers*, &c.

MARTIN, J. The plaintiffs' counsel has favored us with a printed petition for a re-hearing; and as I had not the opportunity of detailing the reasons which induced me to concur in the opinion of the majority of the court when it was read, I am grateful for that which he has given me, of doing so, principally as he informs us, that the position taken by the dissenting Judge, was spontaneously pronounced to be unanswerable, by the whole bar, with the exception of the counsel for the appellants.

The petitioners state, that they were duly appointed by the Governor, with the advice and consent of the Senate, Port Wardens of New Orleans; that the tenure of their said offices is during good behavior; and that they cannot be deprived of them, except in the mode prescribed by the Constitution and laws;— that the defendants, have lately set up a claim to the offices, and pretend to have been appointed to supersede the petitioners under an appointment of the Governor, which is a mere arbitrary assumption of power, in violation of the Constitution and laws, and the vested rights of the petitioners.

On this statement they obtained an injunction, commanding the defendants to refrain from acting in the said offices, until the further order of the court. The petitioner concludes by a prayer, that the defendants, may be decreed not to be Port Wardens of New Orleans; that their commissions may be declared nullities, and the injunction perpetuated; and that they may be condemned to pay damages.

The defendant, Thompson, pleaded the general issue, and averred himself to have been duly appointed a Port Warden, and denied, that the petitioners had any cause of action, or any right to the remedy sought.

The petitioners had judgment, the injunction was perpetuated, and the defendant Thompson appealed. The sole question which the case presents, relates to the continuance of the power of the Governor, after the admission of the State into the Union, to appoint " as often as may be necessary," a Master and three junior Wardens for the port of New Orleans, under an act of the Legislative Council of the Territory of Orleans, of the year 1805.

It is urged, that since the formation of the State government, the Governor can no longer appoint the Port Warden, whenever it is necessary, but only when there is a vacancy ; because, except in the latter instance, the appointment is the removal of an incumbent, which is not within the Constitutional attributions of the Executive ; the Constitution having provided no other mode of removal of a civil officer, except by impeachment, and, in case of other civil officers than the Governor, and Clerks of courts, by an address of a given number of members of both houses, of the Legislature to the Governor.

This argument assumes, that when a power is within the Constitutional attributions of one of the branches of government, it cannot be exercised, when an indirect consequence of its use is one of those, which that branch of government could not have directly produced ; and it is said, that although the Governor may appoint a Port Warden, whenever it is necessary, he cannot do so when an indirect consequence of the appointment is the re moval of an incumbent, which the Constitution does not permit the Governor directly to effect.   It is not pretended, that either the Legislature of the United States, or of this State, can directly remove a Judge, otherwise than by the combined action of the Senate, and House of Representatives, *id est,* by impeachment by one, and judgment by the other ; yet in the year 1802, the Legislature of the Union, exercising one of its Constitutional attributions, *id est,* the repeal of a law of a preceding Legislature, did not think itself prevented from exercising that power, although an indirect consequence of the repeal was the removal of all the incumbents of the judicial offices, which had been created by the law thus repealed.

About the year 1820, the Criminal Court of the First Judicial District of this State, was composed of three Judges, who were permitted to practice the law.   This permission was thought improper, but it could not be withdrawn, without increasing the salary of the Judges, or reducing the number to one, and giving him the salary of the three.

The last alternative could have been easily obtained by an address of three-fourths of the Legislature, to the Governor, representing the utility of it ; but it was thought best to repeal the law

which had established a court composed of three Judges, and to establish another composed of one. Thus, the two junior Judges, who could not have been removed by the direct action of the Legislature, were by the repeal of the law, which was within the Constitutional attributions of that body, indirectly removed.

When that court was directed to hold sessions twice a year, in the country parishes, of the First Judicial District, it was authorized to appoint an Interpreter in each parish; it was however soon ascertained, that the service could be better performed by the Interpreter, of New Orleans, and it was not deemed necessary, that the two houses should address the Governor, for the removal of the country Interpreter. This was done by a law which repealed the preceding under which those Interpreters had been appointed, and they were thus removed. In the year 1825, by the act establishing the City Court of New Orleans, all acts creating Justices of the Peace, and Constables within the City of New Orleans, its faubourgs, banlieus &c., were repealed; thus all those officers were removed without any impeachment, or address to the Governor. The repeal of the laws creating them, was within the constitutional attributions of a bare majority of the Legislature, with the assent of the Governor; and although the circumstance, that the repeal of the acts had, as one of its necessary consequences, the removal of those Justices of the Peace and Constables, who as the counsel for the plaintiffs, contends were removable only by the Governor, on the address of a given number of the members of both houses, it never was doubted, that the repeal was constitutional.

Here we have instances of Circuit Judges of the United States, holding their offices during good behavior, removed from office by an act of Congress. Judges of this State, Justices of the Peace, Constables, and Interpreters, removed by the repeal of the law which had created them; although it is clear, a direct removal of any of them could not have taken place, without an address from a given number of members of the Legislature to the Governor.

It is admitted, that the Port Wardens are among the officers whom the Constitution has declared to be removable by such an address; yet, if a new choice be within the constitutional attri-

butions of the Governor, it must follow, that the removal of the former incumbent as legitimately follows from that choice, as that of the officers above mentioned, from the repeal of the laws creating them. But the counsel for the petitioners has contended, that the Constitution, having withheld from the Governor the power of removing the incumbent, he holds his office during his good behavior, and as the Judges, Clerks of courts, and Notaries Public, can only be removed by an impeachment, or the address of both houses, or at least, that he has a life estate in his office.

The Supreme Court of the United States has lately decided in the case, *Ex parte Hennen*, 13 Peters' Reports, 259, that in the Government of the Union, no office is held during good behavior, except those, the tenure of which has thus been fixed by the Constitution ; and that the offices of those who were appointed for an unlimited period, are not held during life, but are determined by a new choice made by the appointing power.

The counsel for the petitioners has strenuously urged, that the clause in the Constitution of this State which renders all civil officers, except the Governor, and Clerks of courts, removable on the address of the Legislature, prevents the applicability of that decision to the present case. It is, therefore, proper to review the part of the Constitution he invokes. One of the learned counsel for the petitioners, has informed us, that he believes, that the provision is peculiar to the Constitution of this State ; that he has carefully examined those of the other members of this Union, without finding any thing like it. I believe it may be traced to the legislation of Great Britain. In that country the commissions of the Judges were *durante bene placito nostro*, originally, and continued so until the thirteenth year of William the Third, when it was imagined, that their devotion to their country would be better secured by rendering them less dependent on the Crown, and more so on Parliament. Accordingly, by the 23d chapter of the acts of that year, it was provided, that their commissions should be *quamdiu bene se gesserint*, and that it might be lawful to remove them on the application of both houses of Parliament.

Notwithstanding this, it was held, that their offices were deter-

mined on the demise of the King; and in the first year of George the Third, further to secure their independence, it was enacted, on the recommendation of the King, that the demise should no longer have that effect; and the statute has a clause continuing the right of Parliament to address the King for the removal of a Judge.

The framers of our Constitution thought it proper to modify the tenure of good behavior as it still exists in the United States; and established that, which was to prevail in Louisiana, on the footing of the British. They farther thought, that none should exercise any office whatsoever, if he rendered himself obnoxious to a great proportion of both houses of the Legislature. With a view absolutely to confirm the power of direct removal of officers in the same hands, and to prevent officers appointed for an unlimited period from being removed by a new choice of the appointing power, they directed the Legislature to fix the duration of the offices created for an unlimited period. Their object was evidently, to put an end to all tenures of office other than those of good behavior, or for a limited time; from which it is not a forced inference to conclude, that until the Legislature carried the views of the Convention into effect, those offices to which the Governor was by law authorized to appoint whenever he thought it necessary, should not be interfered with. They considered the inconvenience of so little importance, that the application of the remedy might be left to the Legislature. It does not appear to have paid any attention to the constitutional injunction, at least in regard to Port Wardens. The territorial law which first called them into existence, has until now been considered as being still in force, with the modification, that the advice and consent of the Senate are necessary to their appointment, and that the period for which they are to serve is to be fixed by the Legislature. Until then, their tenure is neither good behavior nor for life, but until the Governor, deeming it necessary, makes an appointment. The injunction would have been more effectual, if it had extended to offices thereafter created. The Legislature, however, thought proper to create offices, to be exercised during an unlimited period; Inspectors of flour, tobacco, and Interpreters of courts are among the number; and, in

one instance at least, a Judge, that of the Criminal Court of New Orleans, thought, as the present executive of the State, that the power which the law had given him to appoint an Interpreter to his court, without any limitation as to time of service, included that of making a new choice, *toties quoties*, it appeared to him necessary, and the power was exercised in the year ——. No impropriety was then attributed to this act. Indeed, the removal of the incumbent by the Judge, did not impugn the right of the Governor to remove the Interpreter on the address of both houses. The magistrate who then filled the bench of that court, was a person of great legal acquirements, Judge Turner. Admitting that it is not too late to say, that these repeals, and that appointment were unconstitutional acts, it is certainly too late to say, that they were clearly so, and that their constitutionality cannot be contended for. The counsel for the plaintiffs calls upon us to say, that the Governor's appointment of the defendant, Thompson, as a Port Warden, was an arbitrary assumption of power, in violation of the Constitution. The Judges of this court have always considered themselves as the guardians of the constitutional rights of the people, and as such, authorized to pronounce on the constitutionality of the acts of the two other departments of government; but we cannot say, that any act of theirs is unconstitutional unless it be manifestly so, and the question is not susceptible of doubt. *Syndics of Brooks* v. *Weyman*, 3 Mart. 12. In the case of *Johnson* v. *Duncan et al.*, *Syndics*, Id. 553, we held, that it is only in cases where the incompatibility of the law with the Constitution is evident, that courts will go the length of declaring null an act which emanates from legislative authority. In *Fletcher* v. *Peck*, 6 Cranch, 87, Chief Justice Marshall, says ; " the question whether a law be void for its repugnancy to the Constitution, is at all times, a question of much delicacy, which ought seldom if ever to be decided in the affirmative in a doubtful case. —It is not on slight implication, and vague conjecture, that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the Constitution and the law, should be such, that the Judge feels a clear, and strong conviction of their incompatibility with each other."

There can not be any doubt, that this court is bound to test the constitutionality of the acts of the second branch of the Government of the State, when called upon by a suitor. But it is our duty, and it will always be our inclination, to examine such acts with that attention, caution, and respect, which we use in the examination of the acts of the first branch. Either of those branches is the proper Interpreter of the Constitution, in every case in which it acts within its legitimate sphere ; and its interpretation will be entitled to the respect of both the others. The discrepancy from the Constitution, if doubtful, will not be pronounced by the third branch. The Governor was within his constitutional attributions, when he acted on the question whether the appointment of a Port Warden was necessary. It was his duty to consult the Constitution, and to determine whether it opposed any obstacle to the exercise of his power.

The Senate, on the nomination of the defendants, were bound to inquire into its constitutionality before they sanctioned it with their advice and consent, which are the best evidence we can have, that, in their opinion, it was constitutional.

The best attention which I have been able to give to the arguments offered for a re-hearing, have not convinced me, that we err in sustaining the pretensions of the defendant, Thompson ; much less, that his appointment was a violation of the Constitution.

I regret, that in his printed petition, the counsel for the plaintiffs has forgotten himself so far as to indulge in animadversions on the motives and conduct of the Executive, which nothing in the record justifies.

I am of opinion, that no re-hearing should be granted, and I am commanded by the court to say, that it is refused.